NIMA GHARAVI
4610 North Clark St. #1098
Chicago, IL 60640
+1 (773) 899-4688
dmca@midwestwrestle.com

Movant, *Pro Se*

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

SAN FRANCISCO DIVISION

|  |  |
|---|---|
| IN RE DMCA 512(h) SUBPOENA TO GOOGLE LLC | Case No.: 3:25-mc-80164-WHO <br><br> REPLY IN SUPPORT OF MOTION TO COMPEL COMPLIANCE WITH DMCA SUBPOENA <br><br> **Judge:** Hon. William H. Orrick <br> **Date:** December 3, 2025 <br> **Time:** 2:00 <br> **Courtroom:** Courtroom 2 – 17th Floor |

# **TABLE OF CONTENTS**

Page

I.   INTRODUCTION .................................................................................................. 1

II.  PROCEDURAL HISTORY ................................................................................... 2

III. LEGAL STANDARD ............................................................................................ 3

IV.  ARGUMENT ........................................................................................................ 3

  A.  Google LLC Is the § 512(k)(1) Service Provider ......................................... 3

    1.  Google Qualifies Under § 512(k)(1) as "Operator of Facilities Therefor" .............................. 3

    2.  Effective Notice Under § 512(c)(3)(A) ......................................................... 4

    3.  Google's Functional Integration of YouTube, Google Account, and AdSense ...................... 4

    4.  Cox, Verizon, and Charter Address Which Service Providers Are Subject to § 512(h)—Not Which Corporate Entities May Avoid Compliance ........................................ 6

  B.  AdSense Is Not a Separate Service Provider Under § 512(k)(1) ................................ 7

    1.  Omission from Certification of Interested Entities Confirms No Separate Status ................. 7

    2.  AdSense Does Not Store Infringing Material—Because Google LLC Is the Service Provider 8

    3.  YouTube Monetization Requires AdSense Integration ........................................... 9

    4.  The Siloing Problem: A Roadmap for Statutory Evasion ....................................... 9

  C.  Google's Procedural Objections Are Meritless ............................................. 10

    1.  Magistrate Jurisdiction and Declination Timing ............................................ 10

    2.  Service and Email Confirmation .......................................................... 10

    3.  Meet-and-Confer Record ................................................................. 11

    4.  Extension Requests ..................................................................... 11

    5.  The Court's Own Practice Contradicts Google's Standing Order Arguments ................. 11

  D.  Comparison to 28 U.S.C. § 1782 ....................................................... 12

  E.  Google's Own Misreadings of Precedent ................................................. 12

    1.  Verizon's "Silly" Argument Does Not Support Google ........................................ 12

REPLY IN SUPPORT OF MOTION TO COMPEL COMPLIANCE WITH DMCA SUBPOENA
CASE NO.: 3:25-mc-80164-WHO

      2.    Cox Did Not Authorize Product Silos ..................................................................13

   F.    Limited Discovery Proposal ...............................................................................13

V.    GOOGLE'S CONDUCT WARRANTS JUDICIAL SCRUTINY ..............................................13

   A.    Google Waived All Objections Through Untimely and Boilerplate Responses.......................13

   B.    Google's Shifting Positions and Misrepresentations..................................................14

VI.   CONCLUSION.............................................................................................15

# **TABLE OF AUTHORITIES**

Page(s)

**Cases**

*Chambers v. NASCO, Inc.*,
  501 U.S. 32 (1991)...............................................................................................15

*HI.Q, Inc. v. ZeetoGroup, LLC*,
  2022 WL 17345784 (S.D. Cal. Nov. 29, 2022) ................................................14

*In re Charter Commc'ns, Inc., Subpoena Enforcement Matter*,
  393 F.3d 771 (8th Cir. 2005) .................................................................2, 6, 7, 14

*Internet Subscribers of Cox Commc'ns*,
  *LLC*, 148 F.4th 1056 (9th Cir. 2025) .........................................1, 3, 6, 7, 8, 9, 13

*Noland v. Land of the Free, L.P.*,
  336 Cal.Rptr.3d 897 (2025) .................................................................................15

Ray v. Google LLC,
  2023 WL 7305048 (N.D. Cal. Nov. 6, 2023), aff'd,
  2025 WL 2058822 (9th Cir. July 23, 2025)..........................................................9

*Recording Indus. Ass'n of Am., Inc. v. Verizon Internet Servs., Inc.*,
  351 F.3d 1229 (D.C. Cir. 2003) ...........................................2, 3, 4, 6, 7, 8, 12

*Sacks Holdings, Inc. v. Vaidya*,
  2024 WL 4730424 (N.D. Cal. Nov. 7, 2024) .....................................................13

*Stebbins v. Doe*, et al.,
  No. 24-4992 (9th Cir. Oct. 8, 2024)......................................................................4

*Visual Supply Co. v. Cloudflare, Inc.*,
  No. 3:24-mc-80159-WHO (N.D. Cal. 2025) .................................................11, 12

*WeRide Corp. v. Kun Huang*,
  2020 WL 1967209 (N.D. Cal. Apr. 24, 2020) ....................................................15

**Statutes**

17 U.S.C. § 512(a) ............................................................................................7, 12, 13

17 U.S.C. § 512(b) ..............................................................................................6, 7, 12

17 U.S.C. § 512(c) .......................................................................................3, 4, 6, 7, 8, 12, 13

17 U.S.C. § 512(d) ...........................................................................................................6, 7, 12

17 U.S.C. § 512(h) .............................................1, 2, 3, 4, 5, 6, 7, 8, 9, 10, 11, 12, 13, 15

17 U.S.C. § 512(k) ...................................................................................1, 3, 4, 7, 8, 12, 13

28 U.S.C. § 1782 .......................................................................................................................12

**Rules**

Fed. R. Civ. P. 45 ................................................................................................2, 5, 6, 13

N.D. Cal. Civ. L.R. 3-15 ........................................................................................................7, 8

N.D. Cal. Civ. L.R. 7-2(b) ........................................................................................................12

N.D. Cal. Civ. L.R. 7-3(a) ..........................................................................................................3

Standing Order for Civil Cases, Hon. William H. Orrick

    (N.D. Cal. eff. May 2023)................................................................................................12

Standing Order for Magistrate Judge Sallie Kim

    (N.D. Cal. eff. Nov. 15, 2024) .....................................................................................11

**Other Authorities**

U.S. Copyright Office, *Section 512 of Title 17: A Report of the Register of Copyrights*

    (May 21, 2020).....................................................................................................................9

## I.    INTRODUCTION

This case will determine whether integrated service providers like Google can evade § 512(h) subpoena obligations through internal corporate naming schemes. Google's position, if adopted, would functionally strike down the DMCA's subpoena mechanism.

The stakes extend beyond this dispute. Google's argument—that it can impose artificial product-based limitations and search only the specific system hosting infringing content—would enable Google and every other service provider to create artificial product silos (e.g., "Google Identity Manager") housing all "information sufficient to identify" a user outside the hosting product, leaving only meaningless, provider-specific user ID numbers in the hosting service. This siloing would render the § 512(h) subpoena mechanism functionally inoperative and effectively strike down the statute.  As explained in the Motion to Compel Compliance with DMCA Subpoena ("**Motion to Compel**" or "**Motion**") (Dkt. 3 at 14-16), Google's interpretation would render § 512(h) entirely meaningless.

Exhibit 1 visually illustrates this problem. The first diagram shows the current integrated structure where Google LLC operates YouTube (content storage), Google Account (user authentication), and AdSense (monetization) as unified systems under its control. The second diagram shows the logical endpoint of Google's ever-changing position: if its newest argument—that § 512(h) reaches only YouTube's hosting functions—is affirmed, nothing prevents Google from creating a "Google Identity Manager" product to house all identifying information, leaving only meaningless user ID numbers in YouTube. Under that interpretation, § 512(h) would reach only the hosting service—producing nothing but "User ID# 123." Every other service provider would immediately adopt identical structures. TikTok would create "TikTok Identity Services," Meta would create "Facebook Identity Platform," and all identifying information would migrate to these new products, forever beyond § 512(h)'s reach.

The Court must reject this approach and affirm that Google LLC—as the integrated operator of YouTube, Google Account, and AdSense systems—is the § 512(k)(1) service provider obligated to search all relevant internal systems "with respect to the alleged infringement at issue." *In re Subpoena of Internet Subscribers of Cox Commc'ns, LLC*, 148 F.4th 1056, 1067 (9th Cir. 2025) ("*Cox*").

**Google's Opposition Rests on Three Fatal Flaws:**

**First**, Google misreads controlling caselaw. *Cox*, *Recording Indus. Ass'n of Am., Inc. v. Verizon*

*Internet Servs., Inc.*, 351 F.3d 1229 (D.C. Cir. 2003) ("*Verizon*"), and *In re Charter Commc'ns, Inc., Subpoena Enforcement Matter*, 393 F.3d 771 (8th Cir. 2005) ("*Charter*"), address which service providers are subject to § 512(h) subpoenas—not which products within a qualifying provider may evade compliance through the use of marketing terminology.

**Second**, Google's own conduct contradicts its legal position. Google already produced "Google Account" subscriber information (not just "YouTube" data) in this very proceeding. Gharavi Decl.[1] ¶ 12 & Ex. E. Moreover, Google routinely searches its AdSense product when responding to non-party subpoenas issued pursuant to expedited discovery. *Id.* ¶ 24 & Ex. H.

**Third**, Google's interpretation renders § 512(h) meaningless. Congress did not create an identification mechanism only to prohibit copyright holders from using it to enforce their rights.

## II.   PROCEDURAL HISTORY

Mr. Gharavi served a DMCA § 512(h) subpoena on Google LLC on June 25, 2025. Gharavi Decl. ¶ 4 & Ex. K. Google's objections, due July 9 under Rule 45(d)(2)(B), were not served until July 11. Gharavi Decl. ¶ 7 & Ex. C. Google then raised escalating objections on August 5, August 15, and August 22—all well beyond the deadline. Suppl. Gharavi Decl. ¶ 21; Gharavi Decl. ¶¶ 20-23.

During the August 22, 2025 videoconference, the parties reached an impasse requiring motion practice. Suppl. Gharavi Decl. ¶ 3. Mr. Gharavi explicitly stated he would decline magistrate jurisdiction and Judge Ryu's 5-day rule would not apply. Suppl. Gharavi Decl. ¶¶ 3-5. Neither counsel objected. Suppl. Gharavi Decl. ¶ 5. The parties discussed email service authorization, with Mr. Hinnen indicating it was likely subject to confirmation. Suppl. Gharavi Decl. ¶ 23. As of the filing of this brief, Google still has not authorized email service. *Id.*

On August 25, 2025, Mr. Gharavi emailed both counsel stating there was a "ripe, justiciable controversy" and again asking whether Google authorized email service. Suppl. Gharavi Decl. ¶ 8; Gharavi Decl. ¶ 27 & Ex. A, at 1. Google never responded. Suppl. Gharavi Decl. ¶ 9.

On October 2, 2025, Mr. Gharavi simultaneously filed his Motion to Compel and declination of magistrate jurisdiction. Dkts. 3, 5. Mr. Gharavi served Google LLC's registered agent that same day by

---

[1] Unless otherwise indicated, "Gharavi Decl." is the declaration at Dkt. 3-1; "Suppl. Gharavi Decl." is Dkt. 10-1; "Edlin Decl." is Dkt. 9-1; and "Schramm Decl." is Dkt. 17-1.

hand delivery at 3:59 p.m. Central Time. Suppl. Gharavi Decl. ¶ 11; Dkt. 3-3. Google's counsel represented in an October 9, 2025 email that they received the motion on October 8, 2025. Edlin Decl. Ex. 1, at 9; Suppl. Gharavi Decl. ¶ 12. The Edlin Declaration, however, states counsel received the motion on October 7, 2025. Edlin Decl. ¶ 5. In either case, under Local Rule 7-3(a), Google's opposition was due 14 days after service—October 16, 2025. On October 15, 2025, the matter was reassigned to Judge Orrick. Dkt. 13.

## III.    LEGAL STANDARD

A § 512(h) subpoena may issue only to a "service provider" who stores infringing material on its servers and has received an effective § 512(c)(3)(A) notice. *Cox*, 148 F.4th at 1067; *Verizon*, 351 F.3d at 1236. The D.C. Circuit in *Verizon* emphasized that "the validity of a § 512(h) subpoena still depends upon the copyright holder having given the ISP, however defined, a notification effective under § 512(c)(3)(A)." *Id.* at 1236.

The scope of discovery under § 512(h) extends to all information "with respect to the alleged infringement at issue" held by the service provider. *Cox*, 148 F.4th at 1067. Section 512(h)(6) mandates that "the procedure for issuance and delivery of the subpoena, and the remedies for noncompliance with the subpoena, shall be governed to the greatest extent practicable by those provisions of the Federal Rules of Civil Procedure governing the issuance, service, and enforcement of a subpoena duces tecum." 17 U.S.C. § 512(h)(6).

## IV.    ARGUMENT

### A.    Google LLC Is the § 512(k)(1) Service Provider

#### 1.    Google Qualifies Under § 512(k)(1) as "Operator of Facilities Therefor"

Section 512(k)(1)(B) defines "service provider" as "a provider of online services or network access, **or the operator of facilities therefor**." 17 U.S.C. § 512(k)(1)(B) (emphasis added). Google does not—because it cannot—dispute that it is the operator of facilities for YouTube's online services. This statutory status obligates Google to search all systems "with respect to the alleged infringement at issue." *Cox*, 148 F.4th at 1067.

YouTube, LLC has explicitly acknowledged that a plaintiff "erroneously named YouTube, LLC as a defendant, even though YouTube's parent company, Google LLC, provides the YouTube service."

Motion for Clarification of YouTube, LLC at 4 n.3, *Stebbins v. Doe*, et al., No. 24-4992, Dkt. No. 16.1 (9th Cir. Oct. 8, 2024). This judicial admission establishes that Google LLC—not YouTube, LLC— operates the YouTube platform and provides the services at issue.

### 2. Effective Notice Under § 512(c)(3)(A)

Mr. Gharavi's DMCA takedown notifications were effective under § 512(c)(3)(A). All notices were sent to Google, received by Google employees using @google.com addresses, and processed by Google via its § 512(c) takedown system. Dkt. 1 at 5-26. For example, Google dynamically creates case-specific email addresses such as "YouTube Copyright youtube-disputes+2du9f0npl362007@google.com" to track responses. The "Policy Specialist/Custodian of Records" responding to notices, Meghan Schramm (who submitted the Declaration at Dkt. 17-1), is a Google employee communicating via google-legal-support@google.com, not a YouTube employee. The boilerplate objection letters are on Google letterhead, not YouTube letterhead. Gharavi Decl. ¶¶ 7-8 & Exs. B & C. The record therefore satisfies *Verizon's* requirement that the provider receive an effective notice to justify a § 512(h) subpoena. *Verizon*, 351 F.3d at 1236.

Google admits whomever receives § 512(c)(3)(A) notifications is the service provider. Respondent Google LLC's Opposition to Motion to Compel Compliance with DMCA Subpoena (Dkt. 17) ("**Opp.**" or "**Opposition**") at 5:3-4 ("A copyright owner can submit a 512(c)(3)(A) notification only to a provider that stored the allegedly infringing material"). By Google's own logic, this matter is settled: all notifications were sent to Google LLC, making Google LLC the service provider.

### 3. Google's Functional Integration of YouTube, Google Account, and AdSense

Google's two-step production contradicts its position that only YouTube need be searched. On July 18, 2025, Google produced minimal data accompanied by an export summary marked "Service: YouTube and YouTube Music" and "Resource: Basic Subscriber Info." Gharavi Decl. ¶ 10 & Ex. F.

Mr. Gharavi's July 19 deficiency notice attached an anonymized sample from prior unrelated litigation labeled "GoogleUser.SubscriberInfo.html" marked "Service: Google Account" and "Resource: Subscriber Info"—showing a broader search beyond YouTube. Gharavi Decl. ¶ 11 & Ex. G; ¶ 33 & Ex. M. Google's July 28 production provided that Google-account subscriber data, confirming Google LLC as the § 512(k)(1) service provider operating facilities for YouTube. Gharavi Decl. ¶ 12. & Ex. E.

The export summaries tell the story:

- **First production**: "Service: YouTube and YouTube Music" / "Resource: Basic Subscriber Info"

- **Second production**: "Service: Google Account" / "Resource: Subscriber Info"

If Google's current legal position were correct—that § 512(h) reaches only the specific product storing infringing content—the second production would have been improper. Yet Google voluntarily produced Google Account data without being compelled.

Not until August 5—41 days after subpoena service and 27 days after the Rule 45(d)(2)(B) deadline—did Google communicate its first specific, non-boilerplate objection to producing physical address information. Gharavi Decl. ¶¶ 13, 22 & Ex. A, at 12-14. This late objection further demonstrates Google's integrated data systems and its deliberate delay in taking a consistent legal position.

Google now claims it "declined to produce information from services not reached by Section 512(h)." Opp. at 7:22-24. This is demonstrably false. Google **already produced** Google Account subscriber information, which by Google's own taxonomy represents a different "Service Provider" than YouTube. Either (1) Google's second production was unauthorized under § 512(h), contradicting its voluntary production, or (2) Google implicitly acknowledges that § 512(h) requires searching integrated systems beyond the storage product. Google cannot simultaneously defend the propriety of its Google Account production while claiming § 512(h) prohibits similar searches of AdSense.

Operating a YouTube channel requires a Google account. Monetizing YouTube content through advertising requires an AdSense account. All three services are unified under Google LLC's corporate control, share infrastructure, and are accessible via single sign-on to a centralized Google account. Google's own production demonstrates this integration: the "GoogleUser.SubscriberInfo.html" export marked "Service: Google Account" shows Google's internal data organization treats the user's account as unified across Google's ecosystem. By producing this broader Google-account data in response to Mr. Gharavi's July 19 deficiency notice, Google tacitly admitted that user information responsive to the § 512(h) subpoena exists beyond YouTube's narrow systems. When served with non-party subpoenas in expedited discovery proceedings, Google routinely produces the exact information it refuses here— including AdSense billing addresses. Gharavi Decl. ¶ 24 & Ex. H.

Google argues that YouTube users remained "anonymous" (Opp. at 7:17), and therefore the

information is not available under § 512(h)(3), which requires providers to "expeditiously disclose" information "to the extent such information is available to the service provider." Opp. at 4:27-5:2; 17 U.S.C. § 512(h)(3). But this argument conflates user anonymity to third parties with provider availability. The statute measures availability by reference to what the provider (Google LLC) possesses—not whether users disclosed information to all its products. Google's infrastructure proves the point: YouTube revenue flows through AdSense, which is linked to Google Accounts. Google collects, processes, and integrates subscriber information across these systems daily for payment and verification purposes. This information is available to Google; Google simply refuses to disclose it. A service provider cannot create artificial unavailability by choosing not to examine its own integrated systems.

Google claims this is different because Rule 45 is "subject to judicial oversight and balancing of burdens." Opp. at 6 n.5. This distinction fails. Section 512(h)(6) explicitly provides "the procedure for issuance and delivery of the subpoena, and the remedies for noncompliance with the subpoena, shall be governed to the greatest extent practicable by those provisions of the Federal Rules of Civil Procedure governing the issuance, service, and enforcement of a subpoena duces tecum." 17 U.S.C. § 512(h)(6). Both § 512(h) subpoenas and Rule 45 subpoenas are governed by the same procedural rules.

Google's claim that Rule 45 requires unique "balancing of burdens" absent from § 512(h) is wrong. Section 512(h) already contains proportionality guardrails: the subpoena is limited to information "with respect to the alleged infringement at issue" (*Cox*, 148 F.4th at 1067) held by providers who received effective § 512(c)(3)(A) notice. Congress calibrated the scope at the statutory level—the subpoena cannot reach information unrelated to the infringement, nor providers who don't qualify under § 512(b), (c) or (d). Google's argument—that Rule 45's judicial oversight creates a fundamental distinction—collapses when § 512(h) itself incorporates Rule 45 procedure and imposes its own substantive limitations on scope.

### 4. Cox, Verizon, and Charter Address Which Service Providers Are Subject to § 512(h)—Not Which Corporate Entities May Avoid Compliance

Google's Opposition fundamentally misconstrues the holdings in *Cox*, *Verizon*, and *Charter*. These cases determined **which categories of service providers** are subject to § 512(h) subpoenas based on the functions they perform. They did not authorize service providers who perform qualifying functions

to avoid compliance through internal corporate structures.

In *Cox*, the Ninth Circuit held that § 512(h) subpoenas may issue to service providers performing functions under § 512(b), (c), or (d)—but not to providers performing only § 512(a) conduit functions—"with respect to the alleged infringement at issue." *Cox*, 148 F.4th at 1067. Critically, **none of these cases** authorized a qualifying service provider to fragment its integrated systems and selectively search only one component when responding to subpoenas.

Google admits it performs § 512(c) storage functions with respect to the alleged infringement: "YouTube, the service provider upon whose systems the allegedly infringing material was stored in this case...". Opp. at 4:17-18. Under controlling caselaw, this admission alone subjects Google LLC to § 512(h) obligations. The analysis should end there.

Yet Google attempts to graft a new limitation onto § 512(h): even when a service provider performs qualifying functions, it may arbitrarily restrict searches to whichever internal database it designates as the "storage" system—regardless of how integrated its operations actually are. This interpretation finds no support in *Cox*, *Verizon*, or *Charter*. If Cox or Verizon had performed § 512(c) functions with respect to alleged infringement, **nothing** in those decisions suggests they could have avoided compliance by claiming their subscriber information resided in a different "product" than their storage systems.

## B.  AdSense Is Not a Separate Service Provider Under § 512(k)(1)

Google's argument that AdSense is an independent "service provider" subject to separate § 512(h) treatment is legally unsound and factually contradicted by the record.

### 1.  Omission from Certification of Interested Entities Confirms No Separate Status

Google's Certification of Conflicts and Interested Entities or Persons (Dkt. 8) omits both YouTube and AdSense. Under Civil L.R. 3-15, entities with "a financial interest in the subject matter in controversy or in a party to the proceeding" **must** be disclosed. Google listed only:

- Google LLC
- XXVI Holdings Inc. (Google's parent)
- Alphabet Inc. (ultimate parent)

**Conspicuously absent**: any "YouTube, LLC" or "AdSense" entity with a "financial interest in

the subject matter in controversy." Civil L.R. 3-15(a). If YouTube or AdSense were truly independent service providers—as the Schramm Declaration claims (Dkt. 17-1 ¶¶ 4-8)—they would have substantial financial interests requiring disclosure. Their absence is a **judicial admission** that YouTube and AdSense are not separate entities but rather product names for services operated by Google LLC.

Google characterizes AdSense as "a different service provider" (Opp. at 4:21-23), "a separate Google service" (Schramm Decl. ¶ 4), and a distinct entity with separate Terms of Service. *Id.* ¶ 8. Yet Google failed to disclose AdSense as an interested entity under Civil L.R. 3-15. Either AdSense is a separate service provider with financial interests requiring disclosure, or it is a product operated by Google LLC. Google cannot simultaneously claim independence to avoid subpoena obligations while disclaiming independent status for disclosure purposes.

The only coherent explanation: AdSense is not a service provider at all. It is a marketing term for a product offered by Google LLC—the actual service provider under § 512(k)(1).

### 2. AdSense Does Not Store Infringing Material—Because Google LLC Is the Service Provider

Google argues that § 512(h) cannot reach AdSense because AdSense "does not store, host, or maintain the allegedly infringing content." Opp. at 2:3-5. This argument rests on a false premise: that AdSense is the service provider subject to the subpoena.

AdSense is not the service provider—Google LLC is. Under *Verizon* and *Cox*, a § 512(h) subpoena can only issue to a provider "engaged in storing on its servers material that is infringing." *Verizon*, 351 F.3d at 1233. Google LLC satisfies this requirement: Google LLC, as the § 512(c) service provider, stores infringing videos on YouTube servers, receives § 512(c)(3)(A) notices for those videos, and operates YouTube.

The relevant question is not whether AdSense independently stores infringing material—it is whether Google LLC, as the integrated operator of YouTube, Google Account, and AdSense systems, must search all systems under its operational control when responding to a § 512(h) subpoena. Under *Cox*, the service provider must produce information "with respect to the alleged infringement at issue." 148 F.4th at 1067. AdSense billing information for YouTube accounts that monetized infringing content is directly "with respect to the alleged infringement at issue."

### 3.  YouTube Monetization Requires AdSense Integration

The YouTube Partner Program (YPP) requires content creators to link an AdSense account to earn advertising revenue. "YPP participants **must** create an AdSense account **to receive payment** through Google's AdSense program." *Ray v. Google LLC*, No. 23-CV-04222-TSH, 2023 WL 7305048, at *2 (N.D. Cal. Nov. 6, 2023), aff'd, No. 23-3987, 2025 WL 2058822 (9th Cir. July 23, 2025) (emphasis added). This integration is not incidental; it is central to YouTube's business model and user experience.

### 4.  The Siloing Problem: A Roadmap for Statutory Evasion

As set forth in the Motion to Compel (Dkt. 3 at 14-16), Google's argument invites a catastrophic result illustrated in **Exhibit 1**. The first diagram shows how Google currently integrates user data across YouTube, Google Account, and AdSense. The second diagram shows the likely outcome if Google prevails: Google and every other service provider will immediately create new product silos (e.g., "Google Identity Manager") to house sensitive user data, leaving only meaningless, provider-assigned identification numbers in the hosting service. Service providers could then argue that § 512(h) subpoenas reach only the hosting service, which contains no meaningful user information. The § 512(h) subpoena remedy would become functionally extinct.

Congress enacted § 512(h) precisely to enable copyright holders to identify infringers when the service provider would not voluntarily disclose them. The U.S. Copyright Office recognized § 512(h) serves an essential enforcement function, noting "an inability to uncover the identity of a user behind an IP address, information that is likely to reside nowhere else than with the ISP, dooms a plaintiff's claims, since a plaintiff's inability to identify [a] defendant makes effectuating service or prosecuting the case impossible." U.S. Copyright Office, *Section 512 of Title 17: A Report of the Register of Copyrights* (May 21, 2020), at 167 (cleaned up).

A ruling for Google would render this remedy a dead letter. The Court should reject this interpretation and affirm that the service provider—here, Google LLC—must search all systems under its operational control that contain information "with respect to the alleged infringement at issue." *Cox*, 148 F.4th at 1067.

This is not merely a hypothetical concern. Since service of the instant subpoena on June 25, 2025, Mr. Gharavi has discovered 10 additional YouTube accounts infringing his copyrights. Whether the

Court directs Mr. Gharavi to seek leave to include those accounts in this proceeding, or requires that he seek a separate DMCA subpoena, the ongoing nature of YouTube infringement underscores the critical importance of maintaining § 512(h) as a viable enforcement mechanism. If Google's interpretation prevails and service providers restructure to insulate identifying information, copyright holders like Mr. Gharavi—who face continuous, systematic infringement—would have no practical remedy despite clear statutory rights.

### C. Google's Procedural Objections Are Meritless

#### 1. Magistrate Jurisdiction and Declination Timing

Google claims Mr. Gharavi "sandbagged" Google by not declining Magistrate jurisdiction earlier. Opp. at 8:26-9:3. This accusation is baseless.

In DMCA miscellaneous proceedings, the motion to compel is the first dispositive filing that triggers the need for judicial determination. Mr. Gharavi filed the declination concurrently with the Motion to Compel on October 2, 2025, consistent with this district's practice of linking declination filings to substantive motions requiring adjudication. Dkts. 3, 5.

Google's theory fails on the facts. On October 7, 2025, Mr. Gharavi contacted Chief Magistrate Judge Ryu's courtroom deputy to inquire about the status of reassignment to a district judge. Deputy Garcia informed Mr. Gharavi that Judge Ryu was awaiting Google's response before determining next steps, including scheduling. Mr. Gharavi shared this information with Google's counsel by email on October 10, 2025—six days before Google filed its Opposition. Edlin Decl. Ex. 1 at 3.

Google therefore knew when drafting its Opposition that Judge Ryu would not order reassignment until **after** receiving Google's response to the Motion to Compel. If Judge Ryu would not order reassignment even after a fully briefed motion with a declination attached, filing a standalone declination in August—with no motion attached—would have accomplished nothing. Google's "sandbag" argument is made in bad faith.

#### 2. Service and Email Confirmation

During the August 22 meet-and-confer, Google's counsel indicated email service authorization was likely subject to confirmation. Suppl. Gharavi Decl. ¶ 23. Despite Mr. Gharavi's August 25 follow-up, Google never responded, forcing service on Google's registered agent. Suppl. Gharavi Decl. ¶¶ 8-11.

### 3. Meet-and-Confer Record

Google claims that Mr. Gharavi raised new issues in the Motion to Compel without a prior meet-and-confer. Opp. at 9:3-4. This is false. All topics were substantively discussed during the August 22 meet-and-confer. Gharavi Decl. ¶ 23 & Ex. N. Google provides no contemporaneous response contradicting this account. The documentary record—email chain (Ex. A), meeting notes (Ex. N), and accompanying declarations—establishes detailed meet-and-confer on each issue. Google cannot now claim surprise.

### 4. Extension Requests

Google's request for a two-week extension is baseless. Opp. at 9:10-11. Mr. Gharavi, a *pro se* litigant with no legal education, drafted a thorough Opposition to the Motion to Strike in four days. By contrast, Perkins Coie's seasoned IP and data-security team had nine days after purported receipt on October 7 to respond to the Motion to Compel by the October 16 deadline. Instead, Google **chose** to file a Motion to Strike on October 13. Google's prioritization of frivolous motions and self-inflicted delays do not justify relief.

### 5. The Court's Own Practice Contradicts Google's Standing Order Arguments

Google's entire Motion to Strike rests on the claim that Mr. Gharavi's 25-page Motion violated standing orders. However, the Court's own recent practice in an identical DMCA § 512(h) proceeding directly refutes Google's position.

In *Visual Supply Co. v. Cloudflare, Inc.*, No. 3:24-mc-80159-WHO (N.D. Cal. 2025), the subpoena target filed a 10-page motion to quash with over 100 pages of declarations. *Id.* Dkts. 5, 5-1, 5-2. Sideman & Bancroft LLP filed an 18-page opposition on behalf of Visual Supply Co. *Id.* Dkt. 6. The moving party filed a 15-page reply with more than 80 additional pages of declarations. *Id.* Dkts. 7, 7-1. Under Google's theory, all of these briefs exceeded Magistrate Judge Kim's standing order limiting joint discovery letter briefs to 8 pages. Standing Order for Magistrate Judge Sallie Kim, at 5 (N.D. Cal. eff. Nov. 15, 2024).

Magistrate Judge Kim issued her Report and Recommendation on June 25, 2025, ruling on the merits without striking any brief or objecting to page lengths. *Id.* Dkt. 18.

After reassignment to this Court, the moving party filed a 14-page Motion for De Novo

Determination. *Id.* Dkt. 20. Sideman & Bancroft LLP filed a 21-page opposition. *Id.* Dkt. 21. The moving party filed an 8-page reply. *Id.* Dkt. 22. Each of these briefs exceeded the Court's standing order regarding five-page letter briefs. Standing Order for Civil Cases, Hon. William H. Orrick (N.D. Cal. eff. May 2023).

On October 16, 2025—the same day Google filed its Opposition in this case—this Court issued an order ruling on the merits without striking any brief or objecting to page lengths. *Id.* Dkt. 27. The Court wrote: "Considered de novo, Khimji's motion to quash was untimely and no good cause has been shown to excuse the untimeliness. The motion to quash is DENIED." *Id.* at 4.

The *Visual Supply* briefing sequence demonstrates that both Magistrate Judge Kim and this Court deem Local Rule 7-2(b)'s 25-page limit applicable to enforcement motions in DMCA § 512(h) proceedings. If Google's interpretation were correct, the Court would have struck all six briefs in *Visual Supply* that exceeded standing order limits, including Sideman & Bancroft LLP's 18-page and 21-page briefs. Instead, both judges ruled on the merits, just as Mr. Gharavi requests here.

### D. Comparison to 28 U.S.C. § 1782

Google characterizes § 512(h) as "unusual" because it permits subpoenas "unattached to any pending case." Opp. at 4:2-3. Section 1782 similarly permits discovery for foreign proceedings without a pending U.S. case. 28 U.S.C. § 1782(a). The § 512(h) mechanism is neither unusual nor legally suspect.

### E. Google's Own Misreadings of Precedent

#### 1. Verizon's "Silly" Argument Does Not Support Google

Google claims Mr. Gharavi's interpretation "border[s] upon the silly," citing *Verizon*, 351 F.3d at 1236. Opp. at 6:19-23. This badly misrepresents *Verizon*.

*Verizon* actually states: "Finally, the RIAA argues the definition of '[internet] service provider' in § 512(k)(1)(B) makes § 512(h) applicable to an ISP regardless what function it performs with respect to infringing material—**transmitting it per § 512(a)**, caching it per § 512(b), hosting it per § 512(c), or locating it per § 512(d). This argument borders upon the silly." 351 F.3d at 1236 (emphasis added).

The D.C. Circuit called it "silly" to argue that § 512(h) applies to providers performing **only § 512(a) conduit functions**. The court explained: "Define all the world as an ISP if you like, the validity of a § 512(h) subpoena still depends upon the copyright holder having given the ISP, however defined, a notification effective under § 512(c)(3)(A)." *Id.*

Here, there is **no question** that all DMCA takedown notifications were effective under § 512(c)(3)(A). They were sent to—and acknowledged by—Google LLC using @google.com corporate email addresses. Dkt. 1 at 5-26.

### 2.  Cox Did Not Authorize Product Silos

Google invokes *Cox* to support product-based carve-outs. But *Cox* held only that Cox could not be compelled under § 512(h) because Cox was a transitory-network ISP performing § 512(a) functions exclusively—not storage functions. *Cox Commc'ns, LLC*, 148 F.4th at 1067–69. The court's holding turned on the provider's functional role, not on permissible corporate structuring. Here, Google performs storage functions under § 512(c), making it squarely subject to § 512(h) compulsion. *Cox* provides no support for Google's product-silo approach. Google conflates a holding about which types of service providers qualify for § 512(h) with an authorization for product-based carve-outs within qualifying providers. The Ninth Circuit never countenanced the latter.

### F.  Limited Discovery Proposal

To the extent Google contests the factual premises underlying the YouTube-Google-AdSense integration, Mr. Gharavi respectfully requests leave to serve the limited interrogatories set forth in Exhibit 2. These interrogatories directly address whether Google LLC, as the integrated operator of YouTube's systems, qualifies as the § 512(k)(1) service provider.

## V.    GOOGLE'S CONDUCT WARRANTS JUDICIAL SCRUTINY

### A.  Google Waived All Objections Through Untimely and Boilerplate Responses

*The Waiver Timeline:*

Federal Rule of Civil Procedure 45(d)(2)(B) required objections within 14 days after service—by July 9, 2025. Google did not properly object with specific objections until August 5, 2025—27 days late. Gharavi Decl. ¶ 22 & Ex. A, at 12-13.

Rule 45(d)(2)(B) establishes a 14-day deadline for objections—a bright-line requirement. Although courts recognize narrow exceptions for incapacitation or severe illness (*see Sacks Holdings, Inc. v. Vaidya*, No. 24-mc-80197-PHK, 2024 WL 4730424, at *4 (N.D. Cal. Nov. 7, 2024)), no such circumstances are present here. Instead, Google engaged in productions through July 28, acknowledging its obligations before abruptly reversing course.

*The Boilerplate Nature of Google's Objections:*

Even if timely (they were not), Google's July 11, 2025 objections would be waived as impermissibly boilerplate. District courts routinely strike objections that parrot generic language without particularized factual bases. *HI.Q, Inc. v. ZeetoGroup, LLC*, No. 22-cv-1440-LL-MDD, 2022 WL 17345784, at *12 (S.D. Cal. Nov. 29, 2022); *see also* Motion to Compel at 4-7.

Google's August 5 objection relied on out-of-circuit dicta from a dissenting judge taken out of context by misapplying *Charter*, 393 F.3d 771, 786 (8th Cir. Jan. 4, 2005). Gharavi Decl. ¶ 22 & Ex. A, at 12-13. This is not acting in good faith.

This Court should reject Google's untimely, generic objections as waived.

**B.  Google's Shifting Positions and Misrepresentations**

Google's conduct throughout this proceeding raises serious concerns about its good-faith engagement with the subpoena process:

**First**, Google produced YouTube Account data on July 18, 2025, then voluntarily produced broader Google Account data on July 28, 2025—only to claim on August 5 that its obligation "goes no further than the production of a claimed infringing user's email address." Gharavi Decl. ¶¶ 9-13, 22 & Ex. A at 12-16. This contradicts the data Google had voluntarily provided days earlier.

**Second**, Google repeatedly failed to honor meet-and-confer commitments. Google ignored Mr. Gharavi's August 5 request for a conference (Gharavi Decl. ¶ 27 & Ex. A at 11-12), canceled the August 12 conference less than five hours before the scheduled time (*id.* ¶ 19 & Ex. A at 8-9), and committed during the August 22 conference to confirm both (1) whether Google would authorize email service and (2) whether all affected users had been notified of the subpoena and whether any had objected to disclosure. Gharavi Decl. ¶ 21; Suppl. Gharavi Decl. ¶¶ 23-24. Google never fulfilled either commitment. *Id.* Mr. Gharavi followed up on August 25 requesting confirmation on email service authorization, but Google failed to respond. Suppl. Gharavi Decl. ¶¶ 9, 23-24.

**Third**, Google misrepresented the record. Google claims the Motion contains "over 100-pages of accompanying exhibits" (Opp. at 2:11), or "more than 100 pages of pages [*sic*] of exhibits" (Opp. at 8:19). But the exhibits total exactly 92 pages, of which 78 are substantive material. Gharavi Decl. at 17-108.

Google cites *WeRide Corp. v. Kun Huang*, No. 5:18-CV-07233-EJD, 2020 WL 1967209, at *11

(N.D. Cal. Apr. 24, 2020), and *Noland v. Land of the Free, L.P.*, 336 Cal.Rptr.3d 897, 910-11 (2025), to argue its conduct is not sanctionable. Opp. at 7:27-8:4. In *Noland*, the court imposed $10,000 in sanctions for **negligent** failure to verify AI-generated citations—conduct the court characterized as inadvertent, not intentional. *Noland*, 336 Cal.Rptr.3d 897, 915. Here, by contrast, Google's conduct was **deliberate**: it occurred in direct response to a court-ordered subpoena, involved shifting legal positions after voluntary production, and included repeated failures to honor meet-and-confer commitments.

Mr. Gharavi's original Motion to Compel sought $150.00 in costs for service of this motion. Dkt. 3 at 22-25; Dkt. 3-2 at 4. While Mr. Gharavi maintains his original request, the Court has inherent authority to impose greater sanctions *sua sponte* where appropriate to deter future misconduct and preserve the integrity of the subpoena process. *Chambers v. NASCO, Inc.*, 501 U.S. 32, 44-45 (1991).

## VI.    CONCLUSION

For the foregoing reasons, Mr. Gharavi respectfully requests that the Court:

1. Grant the Motion to Compel Compliance with the § 512(h) Subpoena and order Google LLC to produce all responsive user data and information "with respect to the alleged infringement at issue" held in any Google system, including but not limited to YouTube, Google Accounts, AdSense, and any other systems integrating with YouTube user accounts or advertising infrastructure (*see* Exhibit 1 for visual representation of Google's integrated structure);

2. In the alternative, should the Court determine that additional factual development is necessary before ruling on the Motion to Compel, grant Mr. Gharavi leave to serve the limited interrogatories set forth in Exhibit 2 to establish the factual premises of YouTube-Google-AdSense integration; and

3. Grant such other and further relief as the Court deems just and proper.


Dated: October 23, 2025

Respectfully submitted,

/s/ Nima Gharavi
Nima Gharavi

Movant, *Pro Se*